NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3703-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MIGUEL A. ROMAN-ROSADO,
a/k/a MIGUEL ROMAN, DAMIAN
ROSADO, MIGUEL A. ROMAN,
and MIGUEL A. ROSADO,

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

January 23, 2020

APPELLATE DIVISION

Argued November 12, 2019 – Decided January 23, 2020

Before Judges Sumners, Geiger and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 16-12-0968.

Emma R. Moore, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Emma R. Moore, of counsel and on the briefs).

Regina M. Oberholzer, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Regina M. Oberholzer, of counsel and on the brief).

The opinion of the court was delivered by

SUMNERS, JR., J.A.D.

A stop and a warrantless search of a car defendant was driving[1] uncovered a handgun. After the trial court denied his motion to suppress the search and seizure of the handgun, defendant pled guilty to second-degree certain persons not to possess a weapon, N.J.S.A. 2C:39-7(b)(1). In defendant's appeal, we are asked to decide: (1) whether there was reasonable suspicion to stop the car for violating N.J.S.A. 39:3-33, because the license plate frame on the car's rear license plate "conceal[ed] or otherwise obscure[d]" the words "Garden State" at the bottom of the license plate; and (2) whether the subsequent search and seizure of the handgun was legally permissible. Having considered the record and applicable law, we conclude there was no reasonable suspicion to stop defendant for violating N.J.S.A. 39:3-33, and thus the seizure of the gun is inadmissible to prove a second-degree certain persons offense. Even if there was reasonable suspicion to stop defendant's car, the search did not satisfy the warrant exceptions of the automobile exception, a search incident to arrest, or protective sweep. Accordingly, we reverse and vacate the conviction for

---

[1] Although defendant did not own the car, for convenience, hereafter we will refer to the car as defendant's car.

A-3703-17T4

second-degree certain persons not to possess weapons, and remand so defendant can move to vacate his guilty plea.

I.

We begin with a summary of the facts derived from the trial court's suppression hearing conducted on October 18, 2017.

Deptford Township Police Officer Thomas Warrington provided the only testimony at the suppression hearing. Warrington was on "proactive detail" at approximately 6:47 p.m. on April 17, 2017, when he pulled over defendant's car because the license plate frame covered a portion of the bottom of the words "Garden State" on the rear license plate.[2] Warrington explained on cross-examination that during proactive detail officers look for traffic code violations and try to "develop criminal investigations from that." Having been shown a picture of the car's rear license plate, Warrington admitted he could still clearly read "Garden State," of which he estimated fifteen to ten percent of the words were covered by the license plate frame. Despite being able to clearly see the words "Garden State," it was Warrington's understanding N.J.S.A. 39:3-33

_____

[2] The standard New Jersey license plate, as currently issued, is yellow with black lettering and features the state outline in the center with "New Jersey" at the top and "Garden State" at the bottom. We attach as Appendix A defendant's license plate, inclusive of the offending frame, with the specific plate alphanumeric identifiers redacted. See R. 1:38-7(a).

required that "none of the lettering on the plate including the characters and also the New Jersey Garden State, any lettering [could not] be obstructed by anything." Warrington did not indicate the basis for his understanding but admitted his assessment that N.J.S.A. 39:3-33 was violated was the sole reason for the stop.

Defendant was asked for his driver's license, but he produced a state identification card; his driving license was suspended. Two passengers were also in the car, a woman in the front passenger seat, and a male child[3] behind her in the rear seat. Warrington went back to his patrol car and subsequently discovered defendant had warrants out for his arrest.

Warrington then radioed for backup to help take defendant into custody. Warrington approached the car and asked defendant to step out; the record is unclear if Warrington was alone, or if any other police officer had arrived at the scene. After requesting help, Warrington's testimony often refers to "we" instead of "I." For example, he stated, "we weren't sure what it was" . . . "[w]e

---

[3] The record did not indicate the child's age.

had the other two parties step out of the vehicle" . . . "we conducted a further search on that basis."[4]

As defendant stepped out of the car, Warrington saw "a white garment that looked like it had something bulky wrapped in it, shoved partially under the [defendant's] seat." According to Warrington, "[i]t looked like he might have quickly tried to discard something under the seat when we went to stop him." (Emphasis added). After directing defendant to move to the rear of the car, Warrington stated he was concerned about the object under the seat. Although he wasn't "sure what it was," he explained that it was "just strange," and "could have been a weapon" within the reach of the woman in the front passenger's seat.

Warrington reached into the car, removed the object, and discovered it was an unloaded handgun.[5] Defendant was then placed in handcuffs, and the two other passengers were asked to step out the car. Warrington stated that when

---

[4] This is one of several occasions in which Warrington's testimony shifted to the use of plural regarding the stop and search of defendant's car.

[5] Defendant later testified at his sentencing hearing that he found the handgun while at work and had taken it to sell it to a gun buy-back program at a Camden church.

A-3703-17T4

he leaned into the car again, he smelled burnt marijuana, and proceeded to search the entire vehicle, but found no other contraband.[6]

Following counsel's arguments, the trial judge rendered an oral decision denying defendant's motion and remarked "a more formal opinion" would be issued. Two days later, the judge issued an order and written opinion denying the motion.

The judge ruled the stop of defendant's car was justified as Warrington reasonably suspected defendant violated N.J.S.A. 39:3-33 because the rear license plate frame of defendant's car concealed or otherwise obscured a part of the marking imprinted upon the car's license plate. The judge noted there was no question that defendant's rear license plate was readable but held readability of "Garden State" was not determinative of the statute's violation. The judge found the statute objective in that "prohibiting obstruction of any marking imprinted on the vehicle license plate[,]" had no subjective issue. Thus, even a de minimis obstruction of any marking on the license plate was a violation. The judge remarked that defendant's car was reasonably stopped "[b]ecause this

---

[6] Since no other contraband was found, the trial judge found the testimony regarding "burnt marijuana" to be unimportant.

statute just determines that the imprinted language of the plate can in no way be obstructed."

The judge, discussing an unpublished case from this court,[7] stated:

> The case involved a de novo review of a municipal court appeal as I understand it . . . .  There was a motion to suppress . . . based upon the enforcement of the statute, [N.J.S.A.] 39:3-33, and . . . on a de novo review of the motion to suppress which was granted that it was clear and unambiguous on its face that the words Garden State were imprinted on the license and thus could not be obstructed under the statute which indicates that nothing can be done or nothing can be mounted around the plate that would conceal or otherwise obscure any part of marking imprinted on the plate.
>
> . . . .
>
> Even if a de minim[i]s, minimal covering of any imprinted portion – I'll give it to you, without question, D-1 is a readable license plate. . . .  That's really not the question.  Because this statute just determines that the imprinted language of the plate can in no way be obstructed . . . .  It is thus valid for a law enforcement officer to enforce that.

Addressing defendant's challenge to the search of his car, the judge ruled that Warrington had a lawful ground to effectuate the stop "and any investigation that flows therefrom is proper."  In his written decision, the judge cited <u>State v.</u>

---

[7] The cited opinion, in accordance with our rules, has no precedential value.  <u>R.</u> 1:36-3.

Eckel, 185 N.J. 523, 541 (2006), for the proposition that New Jersey recognizes two grounds for a warrantless search of a motor vehicle incident to arrest: officer safety and preventing the destruction of evidence. Applying that principle, the judge found that Warrington was concerned for his safety after seeing the object that appeared to be hastily shoved under the driver's side seat. Because defendant was not in handcuffs at the time and there were other occupants in the car, the judge found it reasonable for Warrington to reach into the car and secure the unknown covered object that turned out to be a handgun. The judge further determined that had the officer tried to handcuff defendant, instead of reaching for the unknown object, "he would have exposed himself to possible harm from the passengers as his attention would have been focused on securing [d]efendant."

Defendant appeals the order denying his motion to suppress raising the following points of argument:

> POINT I
>
> THE INITIAL STOP OF MR. ROMAN-ROSADO'S VEHICLE WAS NOT SUPPORTED BY REASONABLE SUSPICION THAT AN OFFENSE WAS BEING COMMITTED BECAUSE HIS LICENSE PLATE WAS NOT "OBSTRUCTED" WITHIN THE MEANING OF N.J.S.A. 39:3-33. BECAUSE OFFICER WARRINGTON'S BELIEF TO THE CONTRARY WAS BASED ON AN

UNREASONABLE INTERPRETATION OF THE STATUTE, THE STOP WAS UNCONSTITUTIONAL.

A. In His Motion to Suppress, Mr. Roman-Rosado Argued That the Stop Was Unconstitutional Because Officer Warrington Had Misinterpreted the Law, Not Because He Had Misapprehended the Facts.

B. Both the Language and Meaning of N.J.S.A. 39:[3-33] Are Unambiguous. Therefore, the Officer's Mistake of Law was Not Objectively Reasonable.

i. To "Obscure" Unambiguously Means to Derogate Visibility.

ii. The Unambiguous Legislative Intent Shows that the Law Pertains to Obstruction of the Identifying Number, Not Any Text or Decorative Element of the Plate.

C. Even If Officer Warrington's Mistake of Law Were Reasonable, the "Reasonable Mistake of Law Doctrine" Is Not Compatible with New Jersey's Jurisprudence and Should Not Change the Court's Conclusion.

[i]. The "Reasonable Mistake of Law" Doctrine is Contrary to this Court's Article I, Paragraph 7 Jurisprudence.

[ii]. The Deleterious Consequences of the Doctrine Are Widely Recognized.

POINT II

BECAUSE MR. ROMAN-ROSADO WAS SAFELY REMOVED FROM THE VEHICLE AND THERE WAS NO INDICATION THAT THE PASSENGER OR ACCOMPANYING CHILD WERE A THREAT,

9

ENTRY INTO THE VEHICLE AND SIEZURE OF ITEMS WAS NOT JUSTIFIED BY A CONCERN FOR OFFICER SAFETY AND THEREFORE NOT A VALID SEARCH-INCIDENT-TO-ARREST. THE INVALID SEARCH PROVIDES INDEPENDENT GROUNDS FOR SUPPRESSION.

A. Mr. Roman-Rosado Presented No Threat Which Would be Ameliorated by Choosing to Search the Vehicle Instead of Securing his Person.

B. The Presence of Passengers Did Not Provide Grounds for Search.

Defendant's reply brief argues the following points:

POINT I

THE STATE'S CONSRUCTION OF THE LICENSE PLATE STATUTE IS INCORRECT.

A. The State's Argument with Respect to The Meaning of "Conceal or Otherwise Obscure" is Erroneous Because Unless a License Plate Holder Makes a Plate Less Readable, It Neither "Obscures" Nor "Conceals" the Plate.

B. The State's Argument with Respect to What Content Must be Obscured is Mistaken Because, Contrary to the State's Assertion, Some Plates May Have Identifying or Otherwise Mandated Information at the Edge Which May be Covered By Certain License Plate Frames.

C. The State's Reliance on an Unpublished Decision is Unavailing.

POINT II

BECAUSE THE STATE DID NOT PRESENT ITS
PROTECTIVE SWEEP THEORY BELOW, THIS
COURT CANNOT ENDORSE IT NOW.

POINT III

BECAUSE THE OFFICER LACKED
PARTICULARIZED FACTS DEMONSTRATING
THAT MR. ROMAN-ROSADO OR HIS
PASSENGERS WERE A DANGER, THE NEWLY
PROFFRED PROTECTIVE SWEEP ARGUMENT
MUST FAIL.

## II.

### A.

On review of a motion to suppress evidence, we give deference to the trial court's fact findings underlying its decision, "so long as those findings are supported by sufficient credible evidence in the record." State v. Robinson, 200 N.J. 1, 15 (2009) ("James Robinson") (quoting State v. Elders, 192 N.J. 224, 243 (2007)). Deference is afforded because the factual determinations "are substantially influenced by [the court's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Reversal is warranted only when the court's determination is "so clearly

11

mistaken 'that the interests of justice demand intervention and correction.'" Ibid. (quoting Johnson, 42 N.J. at 162).

We, however, do not defer to the trial court where it "acts under a misconception of the applicable law," State v. Brown, 118 N.J. 595, 604 (1990), and thus we review de novo the court's application of the law, State v. Evans, 235 N.J. 125, 133 (2018) (quoting Elders, 192 N.J. at 243).

B.

Defendant's initial argument that the trial judge erred in determining there was no probable cause to stop him for violating N.J.S.A. 39:3-33 requires us to consider this matter de novo because it involves a legal question – the interpretation of the statute.

A police officer has the right to conduct an investigatory stop of a motor vehicle where there is a reasonable and articulable suspicion that violations of the motor vehicle code or other laws have been or are being committed. State v. Carty, 170 N.J. 632, 639-40 (2002). A law enforcement officer who observes a driver violating "any provision of chapter [three]" or "chapter [four]" is authorized to issue a summons and arrest the driver, without a warrant. N.J.S.A. 39:5-25. However, an automobile search incident to the traffic stop is forbidden absent probable cause of other criminal conduct or if the occupants pose a safety

threat. State v. Pierce, 136 N.J. 184, 205 (1994). "'The principal components of a determination of reasonable suspicion . . . [are] the events which occurred leading up to the stop . . . , and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to a reasonable suspicion. . . .'" State v. Stovall, 170 N.J. 346, 357 (2002) (alteration in original) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)).

The totality of the circumstances determines whether reasonable and articulable suspicion exists to stop a motor vehicle. State v. Pineiro, 181 N.J. 13, 22 (2004). Considering the totality of the circumstances surrounding a Terry[8] investigatory stop, requires a reviewing court to balance "the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions." State v. Davis, 104 N.J. 490, 504 (1986). An investigatory stop or detention is constitutional only "if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity." Elders, 192 N.J. at 247 (internal quotation marks

---

[8] Terry v. Ohio, 392 U.S. 1 (1968).

omitted). The State need not prove the defendant actually committed the offense involved. State v. Williamson, 138 N.J. 302, 304 (1994).

Appellate review must also "give weight to 'the officer's knowledge and experience' as well as 'rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's expertise.'" State v. Citarella, 154 N.J. 272, 279 (1998) (quoting State v. Arthur, 149 N.J. 1, 10-11 (1997)). "The fact that purely innocent connotations can be ascribed to a person's actions does not mean that an officer cannot base a finding of reasonable suspicion on those actions as long as 'a reasonable person would find the actions are consistent with guilt.'" Id. at 279-80 (quoting Arthur, 149 N.J. at 11). A traffic stop based on an objectively erroneous understanding of the law is a violation of a person's personal liberty. State v. Puzio, 379 N.J. Super. 378, 384 (App. Div. 2005). Under the exclusionary rule, evidence obtained in violation of an individual's constitutional rights will be excluded as "fruit of the poisonous tree." State v. Faucette, 439 N.J. Super. 241, 266 (App. Div. 2015).

Before examining N.J.S.A. 39:3-33, we look to our well-settled rules of statutory construction:

> The primary purpose of "statutory interpretation is to determine and 'effectuate the Legislature's intent.'" State v. Rivastineo, 447 N.J. Super. 526, 529 (App. Div. 2016) (quoting State v. Shelley, 205 N.J. 320, 323

(2011)). We initially consider "the plain 'language of the statute, giving the terms used therein their ordinary and accepted meaning.'" Ibid. "We will not presume that the Legislature intended a result different from what is indicated by the plain language or add a qualification to a statute that the Legislature chose to omit." Tumpson v. Farina, 218 N.J. 450, 467-68 (2014) (citing DiProspero v. Penn, 183 N.J. 477, 493 (2005)). When we do not conclude that the "plain reading of the statutory language is ambiguous, . . . or leads to an absurd result," we refrain from looking at "extrinsic evidence, such as legislative history, committee reports, and contemporaneous construction in search of the Legislature's intent." Tumpson, 218 N.J. at 468 (citing DiProspero, 183 N.J. at 492-93).

[Tasca v. Bd. of Trs., Police & Firemen's Ret. Sys., 458 N.J. Super. 47, 56 (App. Div. 2019).]

N.J.S.A. 39:3-33 provides in pertinent part:

No person shall drive a motor vehicle which has a license plate frame or identification marker holder that conceals or otherwise obscures any part of any marking imprinted upon the vehicle's registration plate or any part of any insert which the director, as hereinafter provided, issues to be inserted in and attached to that registration plate or marker.

[(Emphasis added).]

Thus, the key issue is whether the license plate frame on defendant's car concealed or obscured the words Garden State on the car's license plate. The statute does not define or limit the meaning of "conceal" or "obscure." However, the well-understood definition of the verb "obscure" means: (1) "to make dark,

15

dim, or indistinct;" and (2) "to conceal or hide by or as if by covering." Merriam-Webster Collegiate Dictionary 856 (11th ed. 2012). The adjective "obscure" is defined as: (a) "dark dim"; (b) "shrouded in or hidden by darkness"; and (c) "not clearly seen or easily distinguished: FAINT." Ibid.

By applying the common definition of obscure to the statute, we agree with defendant that N.J.S.A. 39:3-33 is unambiguous because it prohibits the concealment and obfuscation of identifying information on license plates. We do not read the statute to establish a motor vehicle violation for cosmetic license plate frames that make minimal contact with lettering on the license plate and do not make the plate any less legible. Especially as is the case here, demonstrated in the Appendix, which shows at best a minimal covering of our state motto, the words "Garden State," by the license plate frame.

Although involving a different type of license plate frame, we find instructive State ex rel. D.K., 360 N.J. Super. 49 (App. Div. 2003), the only published decision interpreting N.J.S.A. 39:3-33. In D.K., the defendant was pulled over when a police officer could not read his car's entire license plate "even at a well-lit intersection because of the tint and glare arising from the license plate's [plastic] cover." Id. at 53. Regarding the statute's word "obscure," we held "[t]he term does not mean, as [the] defendant suggest[ed], to

16

make an object such as a license plate wholly undecipherable but, reasonably construed, means merely to make it less legible." Ibid. In our discussion of the statutory scheme surrounding N.J.S.A. 39:3-33, we inferred the prohibition of equipment that would make a plate "less readable . . . was formulated specifically to address the need for license plate legibility in policing activities and, more recently, at toll barriers employing scanning and photographic devices." Ibid.

Based on our common understanding of the verbs "conceal" and "obscure," coupled with our prior interpretation of the N.J.S.A. 39:3-33 in D.K., a license plate only violates N.J.S.A. 39:3-33 if any part of the license plate's marking is concealed or obscured so as to make it less legible. By "less legible," we mean an inability to discern critical identifying information imprinted on the license plate. Otherwise, this would cause an absurd result where a law enforcement officer, as was the situation here, has the unfettered right to stop a motorist where there is the slightest, and candidly insignificant, covering of "Garden State" on a driver's rear license plate.

Our concern is further heightened by the fact that Warrington was detailed on an assignment to look for traffic code violations with the sole purpose to develop criminal investigations. We cannot envision the Legislature intended a

slight covering of a license plate's words to form the basis for the stop of an otherwise lawful driver when it enacted N.J.S.A. 39:3-33. If such was the case, the statute would have used the word "covers" or "obstructs" instead of "conceals or otherwise obscures," where it states, "conceals or otherwise obscures any part of any marking imprinted upon the vehicle's registration plate."

The trial judge in effect rewrote the statute's language when he stated in his written decision that "the partial obstruction of [d]efendant's license plate gave . . . Warrington reasonable articulable suspicion that the driver had committed a motor vehicle offense." (Emphasis added). There is nothing in the statute that proscribes mere "partial obstruction" of a license plate. Only a license plate marking that is concealed or obscured, meaning it cannot readily be deciphered, constitutes a violation. Accordingly, we see no merit to the State's contention that the statute unambiguously prohibits the partial covering of any lettering at the bottom of a license plate as was the case with defendant's car.[9]

---

[9] The State relies on an unpublished decision, which we do not cite as it has no precedential value. R. 1:36-3.

Hence, we conclude the trial judge erred in interpreting N.J.S.A. 39:3-33 and deciding that Warrington had a reasonable basis for stopping defendant's car for a violation of the statute. Given our conclusion, the subsequent search of defendant's car was unconstitutional, and the handgun seized from that unconstitutional warrantless search was the fruit of the poisonous tree which should have been suppressed. See State v. O'Neill, 193 N.J. 148, 171 n.13 (2007). This matter must therefore be remanded to afford defendant an opportunity to withdraw his guilty plea to second-degree certain persons not to possess a weapon and have the judgment of conviction vacated.

III.

In light of our conclusion that there was no legal basis to stop defendant's car under N.J.S.A. 39:3-33 and therefore the seizure of the handgun was fruit of an unlawful stop, we could dispense with any discussion of his contention that even if the stop was permissible, the search was still illegal. Nevertheless, for the sake of completeness we address the merits of defendant's alternative arguments.

Under the Fourth Amendment to the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution, law enforcement officers must "obtain a warrant 'before searching a person's property, unless the search

19

falls within one of the recognized exceptions to the warrant requirement.'" State v. Cassidy, 179 N.J. 150, 159-602 (2004) (quoting State v. DeLuca, 168 N.J. 626, 631(2001)); see also State v. Pena-Flores, 198 N.J. 6, 18 (2009). Because a warrantless search is presumed invalid, the State has the burden to prove it "falls within one of the few well-delineated exceptions to the warrant requirement." Pineiro, 181 N.J. at 19-20 (quoting State v. Maryland, 167 N.J. 471, 482 (2001)).

Three interrelated exceptions to the warrant requirement are discussed by the trial court or relied upon by the State to determine whether the warrantless search and seizure of the handgun in defendant's car was constitutional. The first exception is the automobile exception. This exception authorizes a law enforcement officer to conduct a warrantless on-scene search of a motor vehicle only when there is probable cause to believe the vehicle contains contraband or evidence of an offense, and circumstances giving rise to this probable cause are "unforeseeable and spontaneous." State v. Witt, 223 N.J. 409, 447 (2015).

The second exception is a search incident to an arrest, which affords an officer the right to search a defendant's person without a warrant if there is probable cause to arrest. State v. Evans, 181 N.J. Super. 455, 459 (App. Div. 1981). The purpose of a search incident to arrest is to protect arresting officers

from potential dangers, as well as to prevent destruction or concealment of evidence. State v. Dangerfield, 171 N.J. 446, 461 (2002).

The final exception is a protective sweep of a vehicle. Law enforcement can perform a warrantless search of the passenger compartment of a vehicle when the totality of circumstances supports a reasonable suspicion a driver or passenger is dangerous and may gain immediate access to weapons. State v. Gamble, 218 N.J. 412, 431-32 (2014).

## A.

Defendant argues reversal of the trial judge's order is warranted due to a procedural flaw in the State's contention on appeal to support the search of his car. The State no longer relies upon its contention raised at the suppression hearing that Warrington's search was incident to arrest. Rather, it now argues the search was done as a protective sweep. Because this theory was not raised below, defendant lacked the opportunity to develop a record to refute it; therefore, he contends this court should decline to consider this newly argued theory. Witt, 223 N.J. at 418-19; James Robinson, 200 N.J. at 19.

There is some merit to this procedural argument. "Parties must make known their positions at the suppression hearing so that the trial court can rule on the issues before it." Witt, 223 N.J. at 419 (citing James Robinson, 200 N.J.

21

at 19). This court will "'decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available.'" Chirino v. Proud 2 Haul, Inc., 458 N.J. Super. 308, 318 (App. Div. 2017) (citing Witt, 223 N.J. at 419). However, the limitation is subject to exceptions, including if a trial error is of such a nature as to produce an unjust result, if the issue is jurisdictional in nature, or substantially implicates the public interest. Id. at 318-19 (citing James Robinson, 200 N.J. at 20; N.J Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 339 (2010)).

As mentioned above, the judge ruled the warrantless search was incident to defendant's arrest because defendant was not in handcuffs and there were other occupants in the car, prompting Warrington's concern for his safety. This, the judge determined, gave Warrington the right to grab the unknown covered object – turning out to be an unloaded handgun – that appeared to be hastily shoved under the driver's side seat. The judge further held it was reasonable for the officer to grab the object, rather than try to handcuff defendant because there were other passengers in the car who could have grabbed and presumably used the object.

The factual issues, however, raised by both the State's prior contention that the warrantless search was permissible as a search incident to arrest and its

new contention based on the protective sweep, essentially invoke the same concerns – Warrington's anxiety for his safety upon seeing an object under the driver's seat. Even though the State has presented different theories to uphold the search, there is no unjust result to consider its protective sweep claim because defendant was given the opportunity to cross-examine Warrington and present his own evidence regarding Warrington's alleged safety concern. In this case, defendant is in effect challenging the same factual issues irrespective of either theory proposed by the State.

B.

Moving to the merits, defendant argues the State's assertion at the suppression hearing – that the search was incident to arrest – is not supported by the record. Citing Eckel, as does the State, defendant avers a search incident to arrest is intended to protect police officer safety and preserve evidence but cannot justify the search of a car after the suspect has been "arrested, removed and secured elsewhere." 185 N.J at 541. Defendant maintains there was no reason for Warrington to reach into the car to secure the object underneath the driver's seat because defendant was outside the car and not a threat to possess it. Dunlap, 185 N.J. at 548-49.

Defendant further argues there was no need to remove the object to prevent it from being destroyed. Because he was removed from the car and had no control over the area at the time the officer reached under the driver's seat, there is no factual support for the trial judge's determination that the search was incident to arrest. Based upon our reading of Gamble, 218 N.J. 412, and State v. Robinson, 228 N.J. 529 (2017) ("Dion Robinson"), we conclude the trial court erred in finding the warrantless search was justified due to Warrington's safety concerns.

In Gamble, police officers were patrolling a neighborhood in response to a dispatch of "shots fired," when the officer's received another dispatch in response to an anonymous 9-1-1 call reporting a person sitting in a van with a gun in his lap. 218 N.J. at 419. When the officers found the vehicle, they could see "the occupants moving frantically inside the van, 'as if trying to hide something.'" Ibid. One of the officers ordered the two people to exit the vehicle; one did, while the other "began to exit and then retreated to the driver's seat." Id. at 419-20. The officer testified he feared the defendant might be trying to retrieve a weapon, so he struck the defendant, pulled him from the van, frisked him for weapons, transferred him to a backup officer, and finally returned to the vehicle to search the interior. Id. at 420.

In finding the search in <u>Gamble</u> was a permissive protective sweep, the

Court reasoned:

> After [the officer] completed the patdown of [the] defendant and did not find a weapon, he returned to the car to conduct a search of the interior of the vehicle. He did so only after a frisk of defendant and his passenger revealed that neither carried a weapon. Yet, their conduct, particularly [the] defendant's conduct, enhanced, rather than allayed, the officers' concern that there was a weapon in the van. The officers' reasonable suspicion that there was a gun in the van that would be within easy reach when [the] defendant and his passenger returned to the vehicle, and the officers' reasonable concerns for their safety and the safety of others did not evaporate when they failed to find a weapon on either defendant or his passenger.
>
> [<u>Id.</u> at 432-33.]

In <u>Dion Robinson</u>, the Court restated the standard for a valid protective

sweep of an automobile following a traffic stop.

> The protective sweep exception in the automobile setting does not turn solely on the potential presence of a weapon in a vehicle. Instead, it addresses the imminent danger to police when a driver or passenger will be permitted access to a vehicle that may contain a weapon or may be in a position to evade or overpower the officers at the scene.
>
> [<u>Dion Robinson</u>, 228 N.J. at 548 (citing <u>Gamble</u>, 218 N.J. at 431).]

25

There, the officer first observed defendant driving shortly after midnight leaving a motel in an area associated with drug activity. Id. at 536. The officer testified the car was being driven in an "unsafe" and a "little suspicious" manner as the defendant activated a turn signal then aborted the turn and crossed into another lane more than once. Ibid. He initiated a traffic stop and pulled the car over in a dim area only illuminated by the lights on the cruiser. Ibid. There were four people in the car, the defendant stated his license was suspended, and handed over the car's registration and insurance. Ibid. When the officer asked the car's occupants where they were going, they gave suspicious answers considering the location and direction the car was traveling. Ibid. And when questioned who owned the car, the defendant stated it was a friend's whose name he did not know. Ibid.

The officer subsequently discovered two of the car's occupants, including the defendant, had warrants for their arrest and were known to carry weapons. Ibid. After the officer called for backup and when three other officers arrived, they ordered defendant and the other occupant with a warrant out of the car, which led to them being searched, handcuffed, and arrested. Id. at 538. The other two occupants were ordered out of the car and a pat-down search revealed no weapons. Ibid. The officer then conducted a sweep of the inside of the car

to check for weapons, finding a handgun. Ibid. After the car was towed from the scene, a search warrant was obtained. Id. at 539. No other weapons or contraband was found in the car. Ibid.

Although the Dion Robinson Court found the officer was justified in believing the car's occupants might be armed, the setting of the stop – late at night in an area known for crime, and the suspicious comments made by the defendant provided reasonable suspicion that a weapon was present, it found the protective sweep was invalid. The Court held that ultimately, because the officers had control of the scene, there were no articulable facts that would reasonably warrant the conclusion that any of the vehicle's occupants could gain immediate control of weapons. Id. at 549.

Here, there is nothing in the record indicating any conduct by defendant or the two passengers in the car, one of which was a child, gave Warrington reasonable concern for his safety. For example, at no point did he indicate he had his hand on his service revolver or had pulled it out of his holster because he feared one of the passengers might grab a weapon that was under the driver's seat. Unlike in Gamble, where the officers were patrolling for "shots fired" and responding to a report of a man in a van with a gun in his lap, Warrington had no reason to believe there was a weapon in the car even though he was on

27

"proactive detail," looking for motor vehicle violations to try and develop criminal investigations.

Further, unlike in Gamble, where the officer observed the van's occupants moving frantically about like they were trying to hide something, and one of them not exiting the van after being ordered to, here, defendant pulled the vehicle over immediately, and provided his identification without quarrel or reluctance. When asked if he had any concern about the woman in the passenger seat, Warrington stated his only concern was that she was still in the car, and there was an unknown object under the driver's seat.

The Court's decision in Dion Robinson underscores that, when determining whether the protective sweep exception applies, a trial court must consider specific and articulable facts that, at the time of the search of a car, a person is capable of gaining immediate control of a weapon. The court must carefully consider the actual risk that exists. Whether that risk is present includes, but is not limited to, consideration of the ratio of police officers to passengers; the ability of the police to keep passengers from reaching for a weapon; and the passengers' willingness to cooperate with the police. 228 N.J. at 549. In Dion Robinson, there were four officers who had control of the scene; here, Warrington was alone and called for backup, but the record is unclear if

other officers were present when he saw the object under the driver's seat. However as mentioned above, after indicating he requested help, Warrington often spoke in the plural tense "we," suggesting other officers were present during the search of defendant's car.

We conclude the court fell short of reciting articulable facts supporting the determination that Warrington was reasonably concerned about his safety which caused him to reach inside defendant's car to grab an unknown object. Warrington initiated his search based on what seems like a hunch that a piece of cloth under the driver's seat contained a weapon, and the mere fact there was a woman in the passenger seat. Warrington did not testify that he observed defendant make a furtive movement, such as shoving an object under his seat, at any time defendant was in the car. He merely stated the object wrapped in a white garment was "partially shoved under defendant's seat" and "looked like [defendant] might have quickly tried to discard something under the seat when we went to stop him." (Emphasis added). This latter statement is purely speculative and not supported by any facts. The record therefore does not support the trial judge's finding that the object appeared to be hastily shoved under the driver's seat, intimating that defendant placed the object there due to being stopped by Warrington. Because there was no basis to justify a

29

warrantless search based upon a protective sweep, or for that matter, a search incident to arrest, we disagree with the judge's order.

In sum, we reverse and remand so that defendant can move to withdraw his guilty plea to second-degree certain persons not to possess a weapon and have the judgment of conviction vacated pursuant to Rule 3:9-3(f).

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3703-17T4



A-3703-17T4